IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CAROLE J. COGAR,

        Plaintiff,

        v.                          Civil Action No. 2:06-CV-29

LINDA S. McMAHON,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    <u>Background</u>

    Plaintiff, Carole J. Cogar, (Claimant), filed her Complaint on March 7, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Acting

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on May 10,

2006.[2]  Claimant filed her Motion for Summary Judgment on June 9, 2006.[3]  Commissioner filed

her Motion for Summary Judgment on September 21, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

        2.    <u>Commissioner's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 13.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so she may give further consideration to Claimant's alleged limitations regarding sitting.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A.    <u>Procedural History</u>

Claimant filed her application for Social Security Disability Insurance Benefits on February 3, 2003, alleging disability since October 1, 2001.  The application was denied and initially and on reconsideration.  Claimant requested review by an ALJ, and received a hearing on March 18, 2004.  The ALJ issued a decision adverse to Claimant on June 3, 2004.  Claimant requested review by the Appeals Council.  On February 4, 2005, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further proceedings.  A second hearing was held before an ALJ on July 6, 2005.  The ALJ issued a second decision adverse to Claimant on August 14, 2005.  Claimant again requested review by the Appeals Council, but it denied this request on January 17, 2006.  This action was filed and proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was 58 years old on the date of the July 6, 2005 hearing before the ALJ. Claimant has a high school education. Claimant has prior relevant work experience as a legal secretary and secretary.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: October 1, 2001 – December 31, 2002.[5]

**Diane Morris, N.P., 12/8/01, Tr. 170**
Diagnosis: radiculopathy

Impression: small paracentral herniated nucleus pulposis at the level of L4-5, spinal stenosis at
the level of (illegible) due to marked hypertrophic and degenerative changes of the posterior
facet joints and hypertrophy of the ligamenta flava, narrowing of the exiting foraminal
bilaterally.'

**J. Spencer, M.D., 12/14/99, Tr. 174**
Diagnosis: pain in mid calf, smoker, bone pain, no injury

Impression: normal chest

**Richard A. Douglas, M.D., 10/7/02, Tr. 192**
Diagnosis: low back pain, right leg pain.  There is mild to moderate spinal stenosis at L4-5
secondary to a herniated disc and increased hypertrophy of the ligament of flavum.

**Physical Residual Functional Capacity Assessment, 4/2/03, Tr. 204**
There is insufficient evidence for an assessment.

**Webster County Memorial Hospital, 4/22/03, Tr. 212**
Diagnosis: bulge at L4-5, chronic pain syndrome

**Webster County Memorial Hospital, 1/13/03, Tr. 214**
Diagnosis: musculoskeletal (illegible), radiculopathy

_____

[5] Claimant was only insured for disability benefits through December 31, 2002.

Some of the evidence in the record comes from before Claimant's alleged onset date of
disability.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim.
See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d
1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y.
2004).  Much of the evidence also comes from after Claimant's disability insurance expired.
Evidence from after the relevant time period should be considered as long as it relates to whether
Claimant had a disability during the relevant time period.  Wooldridge v. Bowen, 816 F.2d 157,
160 (4th Cir. 1987).

**Webster County Memorial Hospital, 12/10/02, Tr. 215**
Diagnosis: right breast pain, chronic back pain

**Webster County Memorial Hospital, 2/24/02, Tr. 216**
Diagnosis: musculoskeletal back pain, right (illegible)

**Webster County Memorial Hospital, 5/29/02, Tr. 217**
Diagnosis: low back pain, right (illegible)

**Debra Jo Blake, PAC, 12/21/02, Tr. 222**
Impression: spinal stenosis, minor nerve root compression related to disc bulging, incidentally noted is a small L1 vertebral body hemangioma, which is of no signifiance

**D. Blake, PAC, 12/18/02, Tr. 223**
Impression: There are no suspicious findings.

**D. Blake, PAC, 5/29/02, Tr. 224**
Chest impression: no acute cardiopulmonary changes

Lumbar spine impression: minimal bilateral facet joint arthritis

**Physical Residual Functional Capacity Assessment, 6/12/03, Tr. 225**
Exertional limitations
 Occasionally lift and/or carry 20 pounds
 Frequently lift and/or carry 10 pounds
 Stand and/or walk about 6 hours in an 8 hour work day
 Sit for a total of about 6 hours in an 8 hour work day
 Push and/or pull: unlimited

Postural limitations
 Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
 Extreme heat, wetness, humidity, noise, vibration, fumes, odors, gases, poor ventilation: unlimited
 Extreme cold, hazards: avoid concentrated exposure

**Psychiatric Review Technique, 6/18/03, Tr. 233**
Medical disposition: no medically determinable mental impairment

**Mona D. Justo, M.D., 6/24/03, Tr. 248**
Ord. diagnosis: back pain

**Mona D. Justo, M.D., 6/9/03, Tr. 249**
Impression: lumbar radiculopathy, spinal stenosis, facet joint arthropathy, myofascial pain

**D. Blake, PAC, 7/30/03, Tr. 257**
Impression: no acute cardiopulmonary changes

**Webster County Memorial Hospital, 7/30/03, Tr. 258**
Diagnosis: unexplained (illegible), persistent back pain, leg cramps, musculoskeletal back pain

**Webster County Memorial Hospital, (unknown month)/2/93, Tr. 271**
Diagnosis: URI, bronchitis

**Webster County Memorial Hospital, 2/29/92, Tr. 272**
Diagnosis: (illegible), skeletal wall – (illegible) sprain

**Webster County Memorial Hospital, 12/29/92, Tr. 273**
Principal diagnosis: Castochronditis

**Webster County Memorial Hospital. 11/20/92, Tr. 274**
Principal diagnosis: injury to the right hand

**Webster County Memorial Hospital 1/20/92, Tr. 275**
Diagnosis: (illegible) right hand, musculoskeletal pain

**Mona D. Justo, M.D., 8/19/03, Tr. 287**
Ord. diagnosis: back pain

**Debbie Blake, PAC, 2/9/04, Tr. 294**
Present diagnosis: persistent back pain, radiculopathy, (illegible), bulging at L4-5.

Are the impairments as alleged by the claimant consistent with your clinical records and observations?  Yes.

The patient cannot engage in heavy work, with heavy work defined as walking and standing most of the time by lifting 50 pounds frequently and up to 100 pounds occasionally.

The patient cannot do medium work, with medium defined as walking and standing most of the time, lifting 25 pounds frequently and up to 50 pounds occasionally.

The patient cannot perform light work, with light work defined as a significant amount of walking and standing, lifting 10 pounds frequently an dup to 20 pounds occasionally, or sitting \

most of the time pushing and pulling.

The patient can perform sedentary work, with sedentary work defined as sitting most of the time, walking and standing occasionally, and lifting no more than 10 pounds

If the patient cannot perform full time work, please specify any work that may be performed on a part time basis: the patient cannot sit for any length of time, and cannot do any prolonged standing

Must the patient alternate positions frequently?  Yes.
Must the patient alternate positions occasionally?  No.

Does the patient need a sit/stand option in order to alternate positions frequently?  Yes.

How long would the patient be able to perform the following activities in view of these physical impairments: sit at one time, stand at one time, walk at one time: minutes

Would it be advisable or necessary for the patient to recline or lie down during the day – with feet up?  Yes.

Would it be advisable or necessary for the patient to have frequent rest periods of sitting during the day?  Yes.

Would the patient be restricted from performing any of the following activities due to these physical impairments alone?  Yes.
    Balancing, stoop/bend, crouching, crawling: never
    Climbing, kneeling, stretching, reaching, squating: infrequent

Does the patient's condition prevent work activity involving any of the following:
    Noise: unlimited
    Environmental hazards: avoid concentrated exposure
    Machiney, jarring or vibrations, excessive humidity, cold or hot temperatures, fumes,
dust: avoid even moderate exposure

Would the patient be expected to experience chronic pain on the basis of the impairments found by you?  Yes.

Would the patient be expected to experience intermittent pain that would be considered severe? Yes.

In order for the patient to stand or walk, does the patient need an assisting device?  No.

If the patient is advised to elevate the feet, please indicate the frequency and reason for this instruction:

Right foot: Yes, frequently to release pressure of the back and spine
Left foot: No.

Can the patient use feet/legs for repetitive movements such as in pushing or pulling leg-feet controls:
Left and right feet: No.  This casues pain to the low back and (illegible) and right leg.

Can the patient use hands for repetitive action in a job where repetition or prolonged use of hands is required?
Simple grasping
Right and left hand: Yes.
Arm controls
Right and left hand: Yes.
Fine manipulation
Right and left hand: Yes.

Based upon medical signs the patient has the following:
Loss of grip strength
Right and left hand: No.
Numbness
Right and left hand: No.

Is the claimant able to sit upright for prolonged periods of time at a desk, console, etc., with his/her head in a forward flexed position?  No.

In your professional opinion, is the patient able to perform any full time job that is 8 hours per day, 5 days a week, on a sustained basis?  No.

In your opinion, does this person have any degree of "functional overlay," i.e., does she have a mental impairment that in combination with her other impairments result in a greater degree of disability than either the physical or mental impairment alone would indicate?  No.

In your opinion, would the degree in severity of the impairments found by you today have been the same in 10/1/01, or do you expect them to last for at least 12 months?  Yes.

Do you feel this person was disabled from all full time work activity on October 1, 2001 and continues to be so at this time?  Yes.

If disabled, but not by October 1, 2001, on what date do you feel this person became disabled from full time work activity?  December 2001.

**Mona D. Justo, M.D., 2/10/04, Tr. 301**
Please state this person's past relevant medical history: degenerative arthritis, gout

Please describe the diagnoses: (illegible), DDD, (illegible), (illegible), myofascial pain

As to each diagnosis, please state upon what clinical findings, laboratory tests, and other data the diagnosis is based:
       (Illegible): MRI on 12/02
       (Illegible): Physical exam/MRI of 12/01
       Myofascial pain: Physical exam
       DDD (illegible): MRI of 12/01

Are the impairments alleged by the patient consistent or inconsistent with your clinical records and observations?  Yes.

Would the patient be expected to experience chronic pain on the basis of the impairments found by you?  Yes.

If yes, please note the degree of chronic pain to be expected: chronic mild to moderate

Would the patient be expected to experience intermittent pain that would be considered severe? Yes.

In order for the patient to be able to stand or walk, does the patient need an assisting device? No.

In your opinion, does this person have any degree of "functional overlay," i.e., does she have a mental impairment that in combination with her other impairments result in a greater degree of disability than either the physical or mental impairment alone would indicate?  No.

**Michael D. Morrello, M.S., 2/19/04, Tr. 313**
WAIS-III
Verbal IQ: 94
Performance IQ: 95
Full scale IQ: 95

WRAT-3
Reading: 48 (raw score), 101 (standard score)
Spelling: 45 (raw score), 105 (standard score)
Arithmetic: 36 (raw score), 90 (standard score)

Diagnostic impression:
Axis I: major depressive disorder, recurrent, severe, anxiety disorder NOS
Axis II: none
Axis III: back pain
Axis IV: economic problem (low income), vocational problem (unemployed)
Axis V: 55

**Mental Residual Functional Capacity Assessment of Work-Related Abilities, 3/12/04, Tr. 319**

Limitations in understanding, remembering, and carrying out instructions

      Understand and remember short, simple instructions, carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work-related decisions: slight

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines

      Sustaining attention and concentration for extended periods: none

      Maintaining regular attendance and punctuality: slight

      Completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

Limitations in social functioning in a normal competitive work environment

      Interacting appropriately with the public, maintaining acceptable standards of courtesy and behavior, ability to ask simple questions or request assistance from co-workers or supervisors: slight

      Working in co-ordination with others without being unduly distracted by them, working in co-ordination with others without unduly distracting them, maintaining acceptable standards of grooming and hygiene, relating predictably in social situations in the work place without exhibiting behavioral extremes, demonstrating reliability: moderate

      Responding appropriately to direction and criticism from supervisors: marked

Adaptation in a work setting

      Ability to be aware of normal hazards and take appropriate precautions: slight

      Ability to respond to changes in the work setting or work processes: marked

Functioning independently in a competitive work setting

      Traveling independently in unfamiliar places: slight

      Carrying out an ordinary work routine without special supervision, setting realistic goals and making plans independently of others: moderate

Limitations in work adjustment

      Ability to tolerate ordinary work stress: marked

**Psychiatric Review Technique, 3/12/04, Tr. 324**

The patient has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:

      Depressive syndrome characterized by at least four of the following:

            Anhedonia or pervasive loss of interest in almost all activities

            Appetite disturbance with change in weight

            Sleep disturbance

Psychomotor agitation or retardation
Decreased energy
Feelings of guilt or worthlessness

Functional limitations and degree of limitation
Difficulties in maintaining concentration, persistence, or pace: mild
Restriction of activities of daily living, difficulties in maintaining social functioning:
marked
Repeated episodes of decompensation, each of extended duration: one or two

The patient has a medically documented history of a chronic organic mental, schizophrenic, etc.,
or affective disorder of at least 2 years' duration that caused more than a minimal limitation of
ability to do any basic work activity, with symptoms or signs currently attenuated by medication
or psychosocial support, and one of the following:
A residual disease process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be predicted to cause
the individual to decompensate.

**<u>Ronald D. Pearse, Ed.D., 4/6/04, Tr. 337</u>**
WAIS-III
Verbal IQ: 92
Performance IQ: 97
Full scale IQ: 94

The test is considered valid.

WRAT-3
Reading: 103
Spelling: 100
Arithmetic: 88

The test is considered valid.

Cognistat
Level of consciousness: alert
Orientation: 12
Attention: 6
Comprehension: screener
Repetition: 12
Naming: screener
Constructions: 4
Memory: 12
Calculations: screener
Similarities: 8

Judgment: screener

Diagnostic impression:
Axis I: no diagnosis
Axis II: no diagnosis
Axis III: reported back pain, possible hypertension and seasonal allergies

Prognosis: fair

## Medical Source Statement of Ability to Do Work-Related Activities (Mental), 4/6/04, Tr. 345

Is the ability to understand, remember, and carry out instructions affected by the impairment? No.

Is the ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment? No.

## Arturo Sabio, M.D., 4/22/04, Tr. 347

Diagnostic impression: degenerative arthritis of the lumbar spine with spinal stenosis

## Medical Source Statement of Ability to Do Work-Related Activities (Physical), 4/22/04, Tr. 352

Exertional limitations

Are lifting/carrying affected by the impairment? Yes.
    The person can occasionally lift and/or carry 25 pounds
    The person can frequently lift and/or carry 20 pounds

Are standing and/or walking affected by the impairment? Yes.
    The person can stand or walk about 6 hours in an 8 hour work day

Is sitting affected by the impairment? Yes.
    The person can sit for about 6 hours in an 8 hour work day

Is pushing and/or pulling affected by the impairment? Yes.
    The person has limitations in the lower extremities of degenerative arthritis L-5 and restricted lumbar flexion due to pain

Postural limitations
    Balancing: frequently
    Climbing, kneeling, crouching, crawling, stooping: occasionally

Manipulative limitations
    Reaching in all directions, handling, fingering, feeling: unlimited

Visual/communicative limitations
    Seeing, hearing, speaking: unlimited

Environmental limitations
    Temperature extremes, noise, dust, vibration, humidity/wetness, hazards: unlimited

**Debra Cutlip, P.A., 6/9/05, Tr. 379**
Impression of left ribs: no abnormal bone pathology

Impression of left ankle: soft tissue swelling, no gross fracture

**Webster County Memorial Hospital, 4/27/05, Tr. 380**
Diagnosis: musculoskeletal back pain, left sciatica

**D. Blake, PAC, 6/14/04, Tr. 381**
Impression of lumbar spine: minor findings

Impression of MRI of lumbar spine: moderately severe spinal stenosis at L4-5. There is a small centrally herniated nucleus pulposis at L4-5 and L5-S1.

**D. Blake, PAC, 6/2/04, Tr. 382**
Impression: no acute cardiopulmonary changes

**Webster County Memorial Hospital, 6/2/04, Tr. 383**
Diagnosis: weight loss unexplained, tobacco usage, chronic back pain and left sciatica

**D. Blake, PAC, 5/10/04, Tr. 386**
Impression: no abnormal bone pathology at the left knee

**Webster County Memorial Hospital, 5/10/04, Tr. 387**
Diagnosis: left knee pain, (illegible), musculoskeletal back pain

**Cynthia Hagan, M.A., and Michael Morello, M.S., 6/9/05, Tr. 389**
WAIS-III:
Verbal IQ: 86
Performance IQ: 89
Full scale IQ: 87

WRAT-3:
Reading: 53 (raw score), 109 (standard score)
Spelling: 46 (raw score), 106 (standard score)
Arithmetic: 32 (raw score), 75 (standard score)

Diagnostic impression:
Axis I: major depressive disorder, recurrent, severe, generalized anxiety disorder
Axis II: no diagnosis
Axis III: lower back pain, pain in legs, arthritis, stenosis of the spine, bulging disks, ruptured disks (all in low back), neck stiffness and pain, and shoulder pain
Axis IV: economic problem, vocational problem
Axis V: 55

**Mental Residual Functional Capacity Assessment of Work-Related Abilities, 6/9/05, Tr. 397**
Limitations in understanding, remembering, and carrying out instructions
      Understand and remember short, simple instructions, carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work related decisions: moderate

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines
      Sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

Limitations in social functioning in a normal competitive work environment
      Maintaining acceptable standards of grooming and hygiene: none
      Ability to ask simple questions or request assistance from co-workers or supervisors: mild
      Interacting appropriately with the public, responding appropriately to direction and criticism from supervisors, working in coordination with others without being unduly distracted by them, working in coordination with others without unduly distracting them, maintaining acceptable standards of courtesy and behavior, relating predictably in social situations in the work place without exhibiting behavioral extremes, demonstrating reliability: moderate

Adaptation in a work setting
      Ability to respond to changes in the work setting or work processes, ability to be aware of normal hazards and take appropriate precautions: moderate

Functioning independently in a competitive work setting
      Traveling independently in unfamiliar places: mild
      Carrying out an ordinary work routine without special supervision, setting realistic goals and making plans independently of others: moderate

Limitations in work adjustment
      Ability to tolerate ordinary work stress: moderate

**Psychiatric Review Technique, 6/9/05, Tr. 403**
The patient has depressive syndrome characterized by at least four of the following:
> Anhedonia or pervasive loss of interest in almost all activities
> Appetite disturbance with change in weight
> Sleep disturbance
> Decreased energy
> Feelings of guilt or worthlessness
> Difficulty concentrating or thinking
> Thoughts of suicide

The patient has generalized persistent anxiety accompanied by three of the following:
> Motor tension
> Autonomic hyperacitvty
> Apprehensive expectation

Functional limitation and degree of limitation
> Difficulties in maintaining concentration, persistence, or pace: mild
> Restriction of activities of daily living, difficulties in maintaining social functioning:
marked
> Repeated episodes of decompensation, each of extended duration: one or two

**Richard A. Douglas, M.D., 1/31/03, Tr. 420**
Impression: moderate lumbar spinal stenosis at L4-5.

**Webster County Memorial Hospital, 10/11/05, Tr. 423**
Diagnosis: (illegible) pain, (illegible) back pain

**Webster County Memorial Hospital, 9/19/05, Tr. 424**
Diagnosis: joint pain, (illegible), left sciatica, (illegible)

**Debra Cutlip, P.A. and Cynthia Osborne, 9/20/05, Tr. 426**
Impression: no radiographic abnormality

**Debra Cutlip, P.A., 9/19/05, Tr. 427**
Impression of thoracis spine: there is no radiographic evidence of fracture or dislocation

Impression of cervical spine: there are minimal degenerative changes of the cervical spine
without evidence of fracture

**Kelby Faulkner, D.O., 9/21/05, Tr. 430**
Admitting diagnosis: chest pain R/O MI
Discharge diagnosis: angina

**Debra Cutlip, P.A.-C., 11/14/05, Tr. 438**

Impression: this study is abnormal and is supportive of moderate to moderately severe right carpal tunnel syndrome.

D.    Testimonial Evidence

Testimony was taken at the March 18, 2004 hearing.  The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q    Do you smoke?

A    Yes, sir.

Q    How much?

A    Probably less than a half a pack a day.

Q    Was it heavier in the past?

A    Yes, sir.

Q    What was the - - what was your heaviest amount?

A    Probably when I was working.

Q    And how much were you smoking?

A    Probably a couple packs - - a pack-and-a-half a day.

                    *              *              *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q    Let me ask you about standing and walking.  Approximately how long can you stand at one time before you need to sit down, just as a general rule?

A    45 minutes to an hour.

Q    Okay.  And has that been true for approximately how long?

A    Probably a year.

Q	Okay.  What about walking?  Now this would be level ground, taking your time, approximately how long or how far can you walk before you need to get up (INAUDIBLE)?

A	Without stopping?

Q	Yeah.  Before you take a rest.

A	I don't know, maybe a quarter of a mile.

Q	All right.

A	I walk down and get the paper and back, and I usually walk down, and stop at my daughter's and sit for five or ten minutes, and then walk back.

Q	So she lives right there?

A	She lives close.

Q	Okay.

A	It's not level, so it takes a little longer coming back.

Q	All right.  So in the course of a normal day, how much time do you think you're up on your feet standing and walking as opposed to sitting or reclining?

A	Percentage of sitting and reclining (INAUDIBLE) much more than walking or standing.

Q	Do I understand by that that the standing and walking is more painful for you than the sitting and the reclining?

A	Yes.  And I notice standing and walking, my leg has more problems, apt to raw or cramp or have the radiation from my back more so.

Q	Now let me ask you, before you developed these back problems, were you more active than you are now?

A        Oh, yes.  Tremendously.

Q        Tell me a little bit about that.  What - -

A        Well, I always worked eight or ten hours a day, whatever was required.  We farmed, we raised the garden, rode horses, walked, rode bicycles, swam.  Swimming is a real discomfort anymore which (INAUDIBLE).  Cleaned house, worked in the yard, mowed the yard.  Was always outside doing something.

Q        Now do you all still have horses and like is there farm land around your house?

A        Yes, we have 30 acres of farm land.

Q        30 acres.  Do you still have animals on it?

A        We have two horses, and two calves and chickens.

Q        How much involvement do you have with the horses, and the calves and the chickens?

A        Feeding them or letting the calves out of the barn.  Basically they don't need fed, I just let them in and out of the barn at night, and in the mornings.

Q        So two times a day?

A        Yeah.  They're therapeutic.  they don't pull at me when I pull at them.

Q        Well, are they like raised for beef or - -

A        Beef cattle.

Q        Beef cattle.  How about the horses?  Tell me about those.

A        The horses are really big  pets because I can't ride anymore.

Q        Have you tried to?

A        Yes.

Q    Approximately could you give me a guess since about - -

A    Probably would be - -

Q    - - October of 2001?

A    Probably.

Q    Well, how many months?

A    When I tried one time, it was real apparent I can't do it.  I don't get on and off real well, and straddling the saddle just doesn't work.

*                    *                    *

Q    All right.  What about being active in terms of helping around the farm?  You indicated you did some feeding of them.  Tell me about the feeding?  How do you handle that?

A    The horses and the calves get a quart of feed a day a piece, so that's not - - you've got two scoops that go in a pan, and that's basically it, and the feed's right besides their stalls so that's not - - you scoop it out, put it over in their feed bucket.

Q    Now in a couple of places in the file, I saw that you said things like I can't lift over 50 pounds, or I can't lift over 30 or 40 pounds or something like that.  Could you tell me a little bit about your lifting, what you can or can't do?

A    I guess in the beginning when I first started hurting, I mean, I could grab a 50 pound bag of chicken feed, and carry it five or six foot and dump it in a barrel, and it hurt, but sometimes it was just nobody was around to do it besides me, and then as time goes on, I can't even lift them up.  A couplel of times I've put pellets in the stove when my husband was gone because that's what we heat with, and your pellets are about 40 pounds.

Q    Okay.  So that more or less is what those weights might correspond to would be

feed sack or pellet - -

A        Pellet bags.

Q        - - bags for the stove.

A        Right.

Q        How often do you think you've lifted as much as 50 pounds over the time that your claim has been pending?

A        Probably a couple.

Q        What do you feel you can comfortably lift and carry on a regular basis?  Or maybe have you always (INAUDIBLE)?

A        No.

Q        Okay.  What do you think you can lift and carry on a regular basis without straining yourself?

A        Without effort?

Q        Uh-huh.

A        I don't know, 10 pounds.  If I pick up my granddaughter, and she's 24 pounds, I'm real careful with her because she makes it uncomfortable, and it's actually it's the problem with my legs going out, and so I'm afraid I'll drop her.

Q        So are you saying you lift her up from time to time?

A        Occasionally.  She's learned to walk so it's not like it used to be.

Q        Okay.  About how often do you think you could lift as much as 24 pounds in a day without it - -

A        Without - -

Q         - - being unduly - -

A         Unduly uncomfortable?

Q         Uh-huh.

A         I'd say I'd average picking her up once a day.  I mean, a lot of times I'm sitting down, and she'll come, and I'll pick her up, but not more than a couple of times, and that gets real uncomfortable, and then I'm afraid I'll drop her, or if I'm carrying anything that's heavy, I'm real  careful because if I'm doing something, and the pain gets bad, then I get unstable, and that's when I'll fall - -

                    *               *               *

Q         Okay.  Tell me what, if any, limitations that you have in using your neck, your shoulders, your arms and your hands if you're limited, and if you're not limited, then just tell me you're not limited.

A         I'm limited in using my hands, but, I mean, even playing on the computer, if I sit down and play a game of solitaire or something, you're - - the right hand goes numb.  If you're sewing, I hurt through my shoulders.  I don't crochet anymore because it hurts my hands and my neck.

Q         Okay.  Let me ask you one at a time about those.  I take it you have a computer at your house?

A         Yes.

Q         How much time do you spend on the computer in a normal day or week?

A         Probably an hour a week.

Q         What do you do on the computer?

A  Play solitaire and (INAUDIBLE).

Q  Okay.  And you said sewing?  Tell me what kind of sewing you do.

A  Right now not much, patch clothes, put buttons on.  I don't sew like I used to.

Q  Well, when you used to, did  you sew like embroidery or quilting or anything like that?

A  Quilt, embroidery, make clothes.

Q  How long has it been since you did any quilting or embroidering or - -

A  It's probably been a couple of years since I've quilted any.  It's been longer than that since I've embroidered.

Q  Now is the reason for that just that you're not interested in it, or do you have difficulty?

A  I have difficulty bending over to quilt, and if you're sewing, your hand - - the hands cramp, and then they get numb.

*   *   *

Q  And you said you did not crochet now?

A  No.

Q  How long has it been approximately?

A  Oh, it's probably been two, two-and-a-half years since I've crocheted any.

Q  I'll ask you the same question, is that anything to do with your condition or just you haven't been interested in doing it?

A  That's one of the things that I just kind of don't have a lot of interest in anymore.

Q  Now as far as turning your head or your neck, or headaches or anything like that,

21

any problems with your head and neck?

A        Turning the neck it hurts sometimes, and when you turn it, it hurts down into your right shoulder this way.

Q        So if you look to the right - -

A        If I look to the right, it hurts my shoulder.

Q        If you look to the left, it hurts the right shoulder.

A        I've noticed a problem with the other side.

Q        Okay.  As far as looking up or down, any particular problem with those movements?

A        Up hurts.

Q        Okay.

A        Bending your head up also hurts clear down my back.  Lifting your arms above your head hurts all the way down your back.

Q        Okay.  Are you talking about movements that kind of throws your back into what I call extension where it makes you arch your back and - -

A        Arch your back.  If you reach above your head to reach something off of the shelf or to stretch, (INAUDIBLE) to stretch, it doesn't feel good to stretch.

Q        All right.  So if I understand, do you feel that you're limited in reaching overhead, not because of your shoulder or your neck, but because of your low back.

A        Because of the low back, right.

Q        Any other motions that are difficult for you that - - for any reason that we haven't talked about?

A       No.

Q       Okay.  Tell me - -

A       Sweeping and mopping hurts.  That's your - -

Q       Okay.  You're talking about twisting your torso?

A       Yeah, your torso movement that comes with - -

Q       All right.  Well, let me ask you about - -

A       - - cleaning house.

Q       All right.  Let me ask you about your housework, and your cooking, and things like shopping.  Do you do that for yourself?

A       Yes.

Q       Okay.  When you take care of your house, are you limited in any way in how much you can do, or when you can do it, anything like that?

A       Yeah.

Q       Tell me a little bit about that.

A       Oh, I probably won't run the sweeper but once a week, and if it's on the carpet, I get down on my knees and do it because it's just easier to scoot on my bottom or the sides of my legs to sweep.  I don't mop real often at all.

Q       Do you have anyone that helps you with any of the housework?

A       No.

Q       So you just do - -

A       Do what I feel like doing, and I've got a good husband.  He just walks over what's left.

Q        Okay.  All right.  What about cooking?

A        I do cook a lot.  I like to cook.

Q        Okay. Could you tell me how much time you spend?

A        In a day cooking?  Probably an hour-and-a-half.

Q        Now when you're doing that, are you standing or sitting, or how are you doing?

A        Oh, I'll start it, and then sit down and let it cook, and watch it.  I don't particularly stand there the whole time.  I don't stand to peel potatoes anymore.  I sit and do that.

Q        What about shopping?

A        We do that together.

Q        Would you have any difficulty doing it?

A        Probably not.

Q        Who carries the groceries in?

A        We do together.  He carries the heavy stuff, and I'll carry the milk or the bread or whatever.

Q        Now what about your mental state, your attitude and your mood and things like that?  How are you getting along that way?

A        I've always been real outgoing and like to be around people, but anymore I'm just as happy to sit inside seven days over on that little farm in my cubby corner where nobody bothers me.

Q        Are you saying you've become more withdrawn?

A        Uh-huh.

Q        Have you lost touch with any of your old friends or old coworkers?

A       Oh, yeah.  We don't have - - for years we've always got together for holidays, and I just - - I mean, if I see them at the store, I speak, but that's good enough for me.

Q       What about your mood as far as responding to other people?  In other words, do you find that when you're with people, that you have any difficulty with things like being irritable or impatient with people?

A       Yeah.

                    *                    *                    *

Q       Okay.  How about stress?  How do you handle stress?  How well do you handle stress?

A       I don't guess real well because that's why I like being by myself.  That's another reason I keep the horses is because they awful good just to talk to and complain to, and they don't say anything to anybody, and they don't tell you you're wrong.

                    *                    *                    *

[RE-EXAMINATION OF CLAIMANT BY ALJ]

Q       Okay.  So give me a run down of a typical day.  What time - - starting in the morning, you get up?

A       I get up at 6:00.

Q       Okay.

A       Sometimes a few minutes before.  I get my coffee, sit in the recliner, heating pad on until about 7:00 or 7:30.  (INAUDIBLE).   Got a little (INAUDIBLE), let her out.  I'll go down and open the door and let the calves out of the barn, and they have hay, so I don't feed them in the morning.  Sometime between 9:00 and 10:00, I'll walk down and get the mail and

the paper.  I try to walk as much as we can because that's - - I need to walk, and Dr. Hustow wants me to walk.

Q        Okay.

A        Let the chickens out which basically consists of opening the door.    The chicken house is reasonably close to the house, so I just get a milk jug full of water in the morning and one in the evening, and - -

Q        Do you have any trouble carrying the jug of water?

A        Not the jug.  I can't carry a - - I used to carry like a two-and-a-half pound of kitty litter bucket full of water - -

Q        Uh-huh.

A        - - but I can't carry it full, so I just use a milk jug, and there's a creek close so it's not that they don't have enough water, it's not a problem, the jug of water.  My grandson usually comes up and feeds them.  He likes doing that, and then I go out maybe a couple of times a day and gather the eggs.

Q        Okay.  And then when do you feed the horses?

A        I usually feed them about 2:00 or 3:00.

Q        And when you do, do you make lunch for yourself and dinner, or - -

A        No, I fix lunch for my husband and dinner.  Lunch is usually - - he likes soup and sandwiches or - - and supper, we try to eat early, and I'll usually have potatoes and beans, and most of the things we've canned which are getting real slim.

Q        Do you have a garden, then, in the summer?

A        We always have had up until - - we didn't have one last year, but we were in the

process of moving.

Q        What, did you can from the year before?  Okay.

A        Had some left.

Q        Okay.

A        Love to garden, and enjoyed it, and it sufficed - - I mean, it really helps.

                              *               *               *

Q        Church activities?

A        Not anymore.  I'm a recluse.

                              *               *               *

Q        All right.  And then the PC, what do you do on that - - on your personal computer on home?  You said about one hour maybe?

A        Probably in a week.

Q        In a week.

A        Yeah.  I'll go play a game.

Q        A game, okay.

A        I don't do anything else on it.

Q        You don't do e-mail?

A        No.

                              *               *               *

[RE-EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q        Okay.  Now getting back to the trips you took - -

A        Uh-huh.

Q        - - have you changed your pattern, or taken any - - made any special arrangements about the trip because of your health - - about the trips because of your health?

A        We stop more often.  We'll drive from probably here to Covington, Virginia, and then stop for a while and get out and walk.  There's a good little rest area down there, and then we go to Lexington and we stop, and then from Lexington on into Paltan.  It's not too far.  As far as Nags Head, when I say I'm tired, Junior just pulls over, and we get out and walk around, and go on.

Q        So that's a week.  You've been doing that how many years?

A        Four.

                        *                *                *

Q        Okay.  Are there times that that trip is difficult for you, or can you usually go anytime you want to?

A        I usually go whenever I want to.  It may take us a little longer to get there, but - -

Q        Okay.  And what do you do when you get to Virginia?

A        Just sit.

                        *                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q        Would you please describe Ms. Cogar's past work?

A        Yes, Your Honor.  Last job she was that was that of a legal secretary in 2002.  That's a skilled position, that's sedentary level, and she was a nurse from '92 to '94 in one position, and '94 to '97 in another position.  That's a skilled job and performed at the heavy level.  And then she was a secretary from '89 to '92, and that is a semi-skilled position at the

sedentary level.

Q       Mr. Panza, do any of those skills, semi-skilled jobs (INAUDIBLE) transferrable
skills?

A       Yes, they can be, Your Honor.

Q       (INAUDIBLE) job and what skill?

A       The position of a nurse (INAUDIBLE) one with medical procedures, the need for
follow up on appointments, dealing with people, ranging from follow up treatment and
evaluation, et cetera, making notes on patient's health and progress, et cetera.  The position of a
secretary involves the ability to type, to perform filing, to organize materials.

Q       Assume the claimant can only perform light work.  How did you describe the
LPN job in exertional?

A       Heavy lifting.

Q       And the secretary was sedentary?

A       Yes.

                                    *               *               *

Q       However, Mr. Panza, (INAUDIBLE) special status exam by (INAUDIBLE) at
Ms. Van Nostrand's request at Exhibit 15-F in which an RFC shows one - - a couple of markeds
and several moderates, but the one I'm interested in, a marked inability to respond appropriately
to criticism, and it's referred to by Ms. Van Nostrand earlier.  Would even an unskilled job, any
unskilled job you named entail responding appropriately to direction and criticism of
supervisors?

A       Yes, Your Honor.

Q       Much like a semi-skilled or skilled jobs.  All the category of jobs require a person in your vocational (INAUDIBLE) would respond appropriately?

A       That's correct because if you're unable to respond, it could affect productivity and performance.  If it affects those categories, well, then, it would result in loss of job.

Q       Okay.  The psychological also said the claimant would have moderate difficulty completing a normal work day, moderate defined as one-third to one-half of the work day.  How much attendance is tolerable in any unskilled or - - first of all, in any unskilled job that may be otherwise be able to be performed?

A       Anymore than an averaging out day-to-day in an (INAUDIBLE) over a continuous period of time or so.

Q       Would that be true even in the claimant's past relevant work as you described?

A       Yes.

Q       There is an RFC of Dr. Mace and his physician's assistant, Debbie Blake, in which the correct version which we discussed at the beginning of the hearing shows the claimant would have to have - - would have to lie down during the day with her feet up, and have to have frequent rest periods. If more than two rest periods were required - - or more than three, lunch and two breaks, would any job be affected if that person had to rest more than the morning break, afternoon break, and lunch?

A       How many times again, I'm sorry?

Q       More than a break in the morning, a break in the afternoon, and more than a break at lunch.  Three.  I would say the request was 15 minutes (INAUDIBLE) time or - -

A       Yes, that would remove those jobs.

*　　　*　　　*

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        I usually state the question a little differently as frequent rest breaks, or that two-thirds of the time.  That's the way frequent is defined on the form.  It says up to two-thirds of the work day, and so up to two-thirds of the time this person is going to require more than the standard breaks, that she's going to be chronically needing extra breaks, and I'm wondering if that's compatable with regular competitive employment.

A        When you say extra breaks, does that mean two or more, or three or more?

Q        Let's say two-thirds of the day.  In other words, she might be able to perform a third of the day - -

A        Uh-huh.

Q        - - just using the normal break period.  The other two thirds of the day she's going to need extra breaks, unscheduled, and she would have to have - - she would have to be allowed the opportunity to take breaks as needed, and for the purposes of reclining or pain relief.

A        Well, can you give me an estimate how many times, and for what length of time?

Q        That's the problem.  It's going to be on an unpredictable - -

A        Oh, unscheduled.

Q        Unpredictable, unscheduled - -

A        So it could be anywhere from five minutes to a half hour.

Q        Right, depending - -

A        Okay.

Q        - - on her - -

A       That would remove all the jobs.

Testimony was also taken at the July 6, 2005 hearing.  The following portions of testimony from that hearing are relevant to this case.

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       All right.  Now did I see in the file something about you actually getting down and sitting on the floor in order to wipe the floor rather than - -

A       If I mop, I get down and, and mop on my bottom or if I run the sweeper, I usually do that.  Standing and bending irritates it, and if I do it for 15 or 20 minutes, then I - - if I stand and do it, then I don't do it and go sit down, but usually I just kind of scoot around on the bottom and - -

Q       Okay, so - -

A       - - take the sweeper nozzle or - -

Q       What, what is it about having to bend down to the floor to do this?  In other words, what movement is it that seems to bother you (INAUDIBLE)?

A       Bending and, and moving around.

Q       Okay, so when you - -

A       You know, when you sweep you've got to - -

Q       Twisting at the waist - -

A       Right.

Q       - - from side to side?  Okay.  And then flexing at the waist forward?

A       Flexing at the waist.

Q       All right.  Now in terms of moving forward or straightening up such as reaching

over your head or something like that, are any of those movements worse for you than others?

A        Bending over does.  I don't reach above my head very often but it pulls and tugs and - - but there's nothing that I do that I actually reach above my head to do.  My daughter will help me dust around the ceiling or she'll wash the windows or - -

*            *            *

[RE-EXAMINATION OF CLAIMANT BY ALJ]

Q        Did you like to read?  Anything in particular?  I mean like novels or like newspaper or none of the above.

A        Oh, I'd read a living magazine or an occasional novel, not - - it had to be really good to keep my train of thought where it was or should be.

Q        All right.  A few other things - - we talked last time you did take some trips to Virginia, Nags Head.  Did you do any more vacationing?

A        We still go to Nags Head in August, yes, sir.

Q        Okay, and I think that's all I had to ask you.  Do you still have like a farmette type of a - - chickens - -

A        Yeah.

Q        - - and horses?

A        Um-hum.

Q        You still feed them?  Grandson helps you feed the chickens.

A        My grandson and granddaughter helps with the chickens and basically I'll open the barn door in the mornings and let the cows out, and they come back in at night, and he's usually there and shuts the door.  If I grain them, they get about half of a four-pound coffee can

of grain just to make them remember they're supposed to come home.

Q      Okay.

A      The horses, I don't ride.  They're pets, but my grandchildren are starting to ride them.

Q      Did you used to ride them in the past or have they always been a pet?

A      I rode horses from the time I was five years old.

Q      And when did you stop that?

A      Last time I tried to ride was probably '98 or '99.

Q      And that's because - - I mean what does - -

A      It hurts.

Q      The, the pain?

A      Yeah.  Even getting in the saddle is uncomfortable so - -

Q      Okay.

                         *              *              *

[EXAMINATION OF MEDICAL EXPERT BY ALJ]

ALJ    Do you have any overall observations other than concluding the claimant does not meet or equal before 12/02, Dr. Reed?

ME     I do not, Your Honor.

                         *              *              *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      LPN, how would you describe that?

A      Medium and it's semiskilled, Your Honor.

Q        Medium and semiskilled, then we have secretary for the equipment company.

A        Sedentary and skilled.

Q        And then we have secretary for the law firm.

A        Sedentary and skilled.

Q        Okay.  Did I overlook any - - those are the three - - oh, the dress shop, although it didn't make a profit.  How would you describe that?

A        That would normally be light and skilled.

Q        Okay.  Let me get my notes here.  I'll find them.  The job of nurse, Mr. Bell, does that impart transferable skills, to you, at the age of - - let's see at the DLI the claimant was 55.

A        To light, sedentary?

Q        Yes.

A        I don't believe it would.

Q        Okay.  Okay.  If the claimant had - - the claimant had stated at the prior hearing, I believe, and it's in Dr. Mesa's and Mr. Blake's - - the PA's RFC that she has to lie down during the day and put her feet up for rest periods.  If she had to take more than three rest periods for 15 minutes at a time during the workday are any jobs you would otherwise name precluded?

A        I don't believe that will allow for a competitive work routine, Your Honor.

Q        With respect to Mr. Morello's two examinations, if the claimant's concentration was so impacted that she could not stay on task one third to two thirds of the day are those jobs affected?

A        They would be eliminated, Your Honor.

Q        I mean are any jobs affected?  This is the last hypothetical I have.  Assume an

individual approaching advanced age under 55 at this - - in this hypothetical. Precluded from performing all but light work; no - - with a sit/stand option, I'm sorry; and no hazards or climbing; that is unskilled and low stress, defined as one- and two-step processes, routine and repetitive tasks primarily working with things rather than people, entry level. With those limitations, sir, can you name any jobs this hypothetical individual can perform?

A        Yes, Your Honor, at the light level I believe that hypothetical individual could function in - - as a bench assembler, light - - you did say light didn't you?

Q        Yes, sir.

A        Four hundred thousand nationally and 3,000 regionally, and a <u>DOT</u> exemplary number for that is 706.684-022.

HA        Would you give me the regional number again please?

VE        Three thousand. Or a laundry folder, light, 50,000 nationally, 650 regionally, and that's 369.687-018.

HA        I'm sorry, could I ask you to repeat that?

VE        369.687-018.

HA        Okay, thank you.

ALJ        Are those jobs consistent with the <u>Dictionary of Occupational Titles</u> or consistent with your experience?

VE        Yes, Your Honor.

                    *                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        Now, Mr. Bell, on the sedentary, skilled work as secretary and would that transfer

to any other type of job other than secretary?

A        I believe that would - - well, it would, it would - - depending on what all was involved, more than likely it was - -like a legal secretary I think there would be some jobs that would be classified in the light range a person who's done legal secretary could do.   But if - - I don't imagine in the normal function of that job, the legal secretary, I wouldn't think there would be any skills like to, to payroll clerk or billing clerk, things like that, because there wasn't bookkeeping involved.

*                *                *

Q        All right.  Just knowing what you know about the market, skills that old, on the basis of changes in the law and changes in the office equipment, as a practical matter would that person have to kind of start from scratch if they were wanting to go back into the field of legal secretary in terms of the equipment and the - -

A        I think I can speak more to the equipment issue - -

Q        Okay.

A        - - than the I defer to the (INAUDIBLE).

Q        Okay.

A        The, the equipment I think would obviously need upgrading.  She would - - that individual would need upgraded - - upgrading to, to learn the, the formatting and the computer. It would all be computerized now more than likely.

Q        So she would need to be kind of retrained.

*                *                *

ATTY All right.  If we have an individual, if we have an individual who is kind of blunt

and outspoken, and tends to - - let's see how I should put this - - this person because of her reaction to other people's behavior and words would have difficulty responding appropriately to direction and criticism from supervisors approximately one-third to one-half the time, and the same would be true working in coordination with other people and interacting with the public. I'm wondering if any of the past jobs or the two jobs that, that you identified would have - - would be impacted, ruled out by those additional hypothetical assumptions?

       VE     Evidently her previous jobs which lasted a significant amount of time weren't, weren't affected negatively, but if, if the - - if the hypothetical individual has the kind of difficulty you described one-third to one-half of the time, they're going to, to not have appropriate responses to supervisory personnel up to half of the time, then that - - one-third to half of the time - - that's where I'm going, I don't believe that's going to be tolerated.

*          *          *

E.      <u>Lifestyle Evidence</u>

       The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Cleans her house by vacuuming, dusting furniture, and mopping floors (Tr. 134)

- Does laundry and mends clothes (Tr. 134)

- Cares for her lawn (Tr. 134)

- Runs errands (Tr. 134)

- Shops for food, medication, and cigarettes (Tr. 135)

- Reads newspapers for thirty minutes per day (Tr. 135)

- Watches television for two to three hours per day (Tr. 135)

- Listens to records and tapes for four to five hours per day (Tr. 135)

- Has hobbies of sewing, quilting, gardening, and walking (Tr. 135)

- Attends activities with her grandchildren (Tr. 135)

- Has a history of smoking (Tr. 193)

- Decorates her home (Tr. 343)

- Feeds her horses and lets her cattle out of her barn (Tr. 475)

- Plays solitaire on her computer (Tr. 480)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in failing to specify whether he determined Claimant could perform her past relevant work as she specifically performed it or as it is generally performed in the national economy, (2) in failing to specify whether Claimant could perform her past relevant work as a legal secretary, secretary, or both, (3) in failing to adequately discuss the evidence regarding Claimant's need for a sit/stand option, (4) in failing to consider whether Claimant's past work still exists, and (5) in making erroneous factual statements.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly determined Claimant could perform her past relevant work and that Claimant did not require a sit/stand option.  Finally, Commissioner argues that some of the statements the ALJ made that Claimant argues were factually incorrect were in fact correct and that although the ALJ did make some factual errors,

those errors are harmless.

B.     The Standards.

     1.     Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

     2.     Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

     3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

     4.     Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

The ALJ's Findings Regarding Claimant's Ability to Perform Her Past Relevant Work

        Claimant first argues the ALJ committed legal error in failing to specify whether he determined Claimant could perform her past relevant work as she performed it or as the work is generally performed in the national economy.  Claimant cites to Social Security Ruling (SSR) 82-61 for authority.  Commissioner argues the ALJ complied with SSR 82-61.  Since the alleged error concerns an error of law, the ALJ's decision is reviewed de novo.  Milburn Colliery Co., 138 F.3d at 528.

        Under the Regulations, if a claimant does not qualify for presumptive disability, a claimant's impairments must prevent him from having the ability to perform his past relevant

work for him to qualify for disability benefits. 20 C.F.R. § 404.1520(e-f). SSR 82-61 provides additional clarity to these Regulations. The Ruling provides a person will be found not entitled to benefits "if he is capable of performing his past relevant work either as he performed it in the past or as it is generally required by employers in the national economy." Pass v. Chater, 65 F.3d 1200, 1207 (4th Cir. 1995) (citing SSR 82-61). These two methods for denying benefits "are clearly meant to be disjunctive. If the claimant is found to satisfy either test, then a finding of not disabled is appropriate." Pass, 65 F.3d at 1207 (quoting Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)). SSR 82-61 further states Commissioner may rely upon the Dictionary of Occupational Titles to consider a job "as it is usually performed in the national economy." The Ruling recognizes the Dictionary of Occupational Titles (DOT) may not accurately describe the jobs performed by some persons. However, where the actual demands of a person's previous job exceed the description given in the DOT, but the person "can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" SSR 82-61.

In this case, the ALJ found Claimant not disabled because she could perform her prior relevant work. (Tr. 22). The ALJ determined Claimant had prior relevant work as a legal secretary and secretary. (Id.). The ALJ cited DOT 201.362-030 for the notion that the work was sedentary in nature. (Id.). Since the ALJ's RFC allowed Claimant to perform this work, the ALJ found Claimant not disabled. (Id.). The ALJ did not explicitly state whether he found Claimant could perform her prior work as she actually performed it or whether she could perform her prior work as it is generally performed in the national economy. (Id.).

In referencing the DOT, the ALJ clearly found Claimant could perform her prior work as

it is generally performed in the national economy. As mentioned above, SSR 82-61 provides the ALJ may use the DOT to consider whether a claimant has the ability to perform a position as it is generally done in the national economy. This is not provided for in determining whether a claimant can perform a job as he actually did it. SSR 82-61. By referencing the DOT, the ALJ clearly indicated he found Claimant could perform her prior work as generally done in the national economy. See also Pass, 65 F.3d at 1207 (holding that since the claimant "could perform his job as he did in the past, it is unnecessary to consult the DOT in order to determine whether Pass would be able to perform the position . . . as it currently exists in the national economy"). Claimant's argument that the ALJ's decision is confusing in this regard is without merit.

II.

The Work the ALJ Found Claimant Capable of Performing

Claimant argues the ALJ's decision is confusing. He notes that although the ALJ found Claimant had prior relevant work as a legal secretary and secretary, the ALJ only cited the DOT listing for secretary. Claimant contends it is unclear which of these two jobs the ALJ found Claimant could perform.

Claimant is correct that the ALJ found her to have past relevant work as a legal secretary and secretary, but only referenced the DOT listing for secretary. (Tr. 22). Also, the ALJ only states Claimant "could return to her past relevant work as secretary." (Id.).

While it may be unclear whether the ALJ determined Claimant could return to her prior work as a legal secretary, it is certainly clear from the DOT reference and the explicit statement that the ALJ determined Claimant could perform her prior work as a secretary. Claimant's

argument that it cannot be determined which job the ALJ found her capable of doing lacks merit. Claimant need only be able to perform one of her prior jobs for Commissioner to deny benefits. SSR 82-61.

III.

The ALJ's Consideration of Claimant's Alleged Limitations Regarding Sitting and Standing

Claimant next contends the ALJ committed error in calculating her residual functional capacity (RFC) by neglecting to discuss her alleged limitations regarding sitting and standing due to pain. Claimant cites to SSR 82-62 for the notion the ALJ should have discussed Claimant's testimony and the medical evidence regarding these impairments. Commissioner argues the evidence supports the ALJ's decision. The Court reviews the ALJ's factual findings for substantial evidence and his legal conclusions de novo. Milburn Colliery Co., 138 F.3d at 528.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. However, subjective symptoms "may not be dismissed merely

because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id.

The ALJ complied with the first step of Craig by expressly considering whether Claimant has impairments that could cause the symptoms alleged. The second administrative decision referenced the evaluation of Claimant's complaints in the first decision. (Tr. 22). In the first decision, the ALJ concluded Claimant had impairments that could cause the symptoms alleged to a degree, but the evidence failed to support the significant impairments alleged. (Tr. 49). Thus, the ALJ fulfilled the first Craig step.

When the ALJ considered Claimant's subjective complaints of pain at the second step of Craig, he evaluated her alleged limitations regarding sitting and standing. The ALJ noted:

> She described the pain as an aching, burning, cramping, and stabbing sensation. She reported that the pain was present on a continuous basis. She reported that the stabbing pain was not as frequent as the aching sensation and that it lasted 15 to 20 minutes. The claimant reported that as a result of her pain she was unable to sit or stand for prolonged periods, lift up to 40 to 50 pounds, stoop, or bend or walk for long periods. The claimant reported that her pain was exacerbated by lifting, turning, sitting, standing, or walking for long periods of time. The claimant reported that her pain was relieved or made better by limiting her activity or resting.

(Tr. 48) (emphasis added). Clearly, the ALJ considered Claimant's alleged complaints regarding sitting and standing.

Claimant admits the ALJ examined the above evidence, which came from a personal pain questionnaire, but argues the ALJ erred in failing to consider her testimony from the hearings regarding her limitations in sitting. This argument is also without merit. Claimant reported in her personal pain questionnaire that it is because of low back pain that sometimes radiates into her lower leg that she is unable to sit or stand for extended periods. (Tr. 128). The ALJ noted

Claimant testified at the hearing about back problems. (Tr. 48). He stated Claimant "complained of a worsening of her back pain with the passage of time and testified that it started radiating into the right leg." (Id.). Claimant was noted to have "described a burning sensation across her low back going into the hip. (Id.). The claimant testified that her right leg pain is not always bad, but that she "occasionally gets sharp, sudden pain." (Id.). Although the ALJ did not consider Claimant's testimony regarding her alleged limitations in sitting for extended periods, he did consider the source of that limitation, which is pain in her back and legs. The Court believes this is sufficient.

Claimant also alleges the ALJ failed to consider whether the medical evidence supported the alleged limitations in sitting. Again, Craig is applicable. Once the ALJ found Claimant has medical impairments that could reasonably be expected to cause the impairments alleged, he had to consider all evidence. Craig, 76 F.3d at 595. Claimant's argument here is plainly mistaken. The ALJ extensively discussed the impairments Claimant alleged resulted in her sitting limitations. (Tr. 49-51). The ALJ noted that in December 2001 Claimant was found to be unable to sit for significant periods of time. (Tr. 49, 157). The ALJ also noted Claimant was found to have a small paracentral herniated nucleus pulposus at the L4-5 level that same month. (Tr. 49-50, 170). The ALJ's opinion correctly stated Claimant complained in May 2002 of back pain and stated she could not come to a comfortable position. (Tr. 50, 217). The ALJ noted other medical records speaking of the pain causing Claimant's problems in sitting. (Tr. 50). Nevertheless, the ALJ declined to fully credit this limitation. (Tr. 50-51). The ALJ noted Dr. Justo found Claimant had about 4/5 strength in her right lower extremities. (Tr. 50, 252). He further gave attention to a physical residual functional capacity assessment from December 2002,

which found Claimant retained substantial ability to perform work. (Tr. 51, 225). Claimant's argument that the ALJ failed to discuss the medical evidence lacks merit.

Next, Claimant appears to argue the medical records contradict the ALJ's decision to not include a sit/stand option in the RFC he assigned Claimant. Claimant points to evidence in the record she claims shows she needs a sit/stand option.

In this regard, the Court finds the medical records sufficiently undermine confidence in the ALJ's decision so that a remand will be necessary so the ALJ may more fully explain his rationale. The ALJ's own opinion is full of citations to medical evidence supporting Claimant's alleged limitations in sitting and standing. (Tr. 49-51). During the period in question, Claimant was noted to be "obviously uncomfortable" when sitting. (Tr. 157). An MRI revealed her to have a paracentral herniated nucleus pulposus and spinal stenosis due to marked hypertrophic and degenerative changes. (Tr. 170). Another MRI from 2002 demonstrated Claimant suffered from spinal stenosis and minor nerve root compression. (Tr. 222). Claimant has been found to have facet joint arthritis. (Tr. 224). In the assessment of Dr. Justo the ALJ relies upon for minimizing Claimant's limitations, Dr. Justo determined Claimant suffered from lumbar radiculopathy, spinal stenosis, facet joint athropathy, and myofascial pain. (Tr. 253). Dr. Justo recommended a steroid injection. (Id.). Other records also provide support for Claimant's limitations in sitting. (Tr. 195, 212, 217).

The ALJ appears to have rejected the need for a sit/stand option based on one of three reasons. The first is that Claimant's activities of daily living are inconsistent with the limitations alleged. (Tr. 49). The second is that findings regarding the alleged limitations came after the Claimant's disability insurance expired at the end of 2002. (Tr. 50-51). Finally, the ALJ placed

48

great weight on physical residual functional capacity assessment from 2003. (Tr. 51).

The Court believes that given the significant amount of evidence supporting the alleged limitations in sitting, the ALJ should have done more to explain his reasoning. First, although it is true that some evidence was produced after Claimant's disability insurance expired, this does not mean it is irrelevant. Evidence from after the relevant time period should be considered as long as it relates to whether Claimant had a disability during the relevant time period. Wooldridge, 816 F.2d at 160. The ALJ makes repeated references to the need to establish impairments within the relevant time period. (Tr. 50). At one point, for instance, he states "there is no showing that this physician examined the claimant during the period in question." (Id.). While the ALJ may have understood that relevant evidence does not need to come from the relevant time period, the Court has serious doubts. Second, the ALJ appears to have placed extreme weight on the physical residual functional capacity assessment from 2003. (Tr. 51). Although the ALJ may certainly consider this evidence, the opinions of treating physicians should normally receive controlling weight. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (stating that "Courts often accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant"). The ALJ appears to have relied upon the physical residual functional capacity assessment to a significant extent, while minimizing records from those who treated Claimant. Finally, in light of these considerations, the Court cannot say the ALJ's assessment of Claimant's activities of daily living is enough to affirm the decision.

Therefore, this case should be remanded to the ALJ for further consideration. The ALJ should carefully consider the evidence regarding Claimant's alleged limitations in sitting. The

ALJ should realize that subjective complaints may not be discredited merely because they are not fully supported by the objective medical evidence. Craig, 76 F.3d at 595. He should also keep in mind that evidence produced after the relevant time period is relevant as long as it relates to time period at issue. Wooldridge, 816 F.2d at 160. The ALJ should indicate the weight he gives to the various opinions in the record and his reasons for doing so.

IV.

The ALJ's Consideration of the Current Relevance of Claimant's Work Experience

Claimant next argues the ALJ failed to account for testimony from the Vocational Expert that her past work experience would not transfer to current positions due to the gap in time between when she last worked and current work conditions. Claimant argues this testimony shows she cannot perform her past work.

In Barnhart v. Thomas, 540 U.S. 20, 23-29 (2003), the Supreme Court held the Regulations make it irrelevant whether a claimant's past work actually exists or not. If a claimant can perform his past relevant work, he is not entitled to disability benefits, regardless of whether or not his past work still exists. Id. at 29. Thus, Claimant's argument that the ALJ was required to consider whether she could return to her prior work as Claimant performed it necessarily fails.

V.

Claimant's Allegations of Factual Errors in the ALJ's Decision

Finally, Claimant alleges the ALJ made factual errors in his opinion. Claimant argues the ALJ confused Claimant's history of work as a legal secretary and secretary. She also argues the ALJ mistakenly concluded she left her job as a secretary of her own will, when in fact she was

fired. Commissioner argues that while the ALJ did mistakenly write legal secretary where he meant to write secretary, such error is harmless. Otherwise, Commissioner argues the ALJ's findings are correct. The ALJ's findings will be upheld as long as supported by substantial evidence. Milburn Colliery Co., 138 F.3d at 528.

The ALJ's opinion stated Claimant left her position as a legal secretary to care for her ailing mother. (Tr. 19). It also stated Claimant returned to her legal secretary job, but left again shortly thereafter because she did not get along with her employer. (Id.). The ALJ stated Claimant quit this job of her own will. (Tr. 20).

Claimant's testimony indicated it was her job as a secretary, not her position as a legal secretary, that she left to care for her ailing mother. (Tr. 511). Claimant returned to this job after her mother's death, but left again soon thereafter. (Id.). Since the ALJ identified this position as that of legal secretary, his opinion was in error.

Nevertheless, the Court believes this error was harmless. The situation here is closely analogous to that found in Diorio v. Heckler, 721 F.2d 726 (11th Cir. 1983). The ALJ there stated the claimant "was closely approaching advanced age," when in fact the Regulations characterized him as "closely approach[ing] retirement age." Id. at 728. The Diorio ALJ also considered work he should not have. Id. Yet because these errors did not affect the outcome of the case, the court held them harmless. Id. In this case, the ALJ wrote legal secretary where he meant to write secretary. The error could be corrected by simply deleting the word legal. If the Court remanded the case based on this error, this is undoubtedly what would happen. Hence, this error represents a classic case of harmless error.

Claimant also stated in her testimony that after she returned to her job as a secretary, she

left because she "just didn't click" with her employer. (Tr. 511). She and her employer "just decided it was better to part ways than find something else to do." (Tr. 510). This testimony provides substantial evidence to support the ALJ's conclusion Claimant left her job as a secretary of her own will. Claimant's arguments of error under this heading are without merit.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so she may give further consideration to Claimant's alleged limitations regarding sitting.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the

Northern District of West Virginia.

DATED: February 27, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE